**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JACOB FIKTUS, | ) | CASE NO. 1:20cv1689 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| KILOLO KIHAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

Plaintiff, Jacob Andrew Fiktus ("Plaintiff" or "Fiktus"), challenges the final decision of

Defendant, Kilolo Kihakazi,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications  for a Period of Disability ("POD") and Supplemental Security Income

("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et*

*seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

# I.  PROCEDURAL HISTORY

On April 26, 2018, Fiktus filed an application for POD and SSI, alleging a disability onset date of November 24, 1997, and claiming he was disabled due to cerebral palsy.  (Transcript ("Tr.") at 71, 160.)  The applications were denied initially and upon reconsideration, and Fiktus requested a hearing before an administrative law judge ("ALJ").  (Tr. 98-100, 106-10, 111-13.)   On July 11, 2019, an ALJ held a hearing, during which Fitkus, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 35-70.)  On July 25, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id*. at 15-34.)  The ALJ's decision became final on June 2, 2020, when the Appeals Council declined further review.  (*Id*. at 2-7.)

On July 30, 2020, Fitkus filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17, 18.)  Fiktus asserts the following assignments of error:

(1)   The ALJ committed harmful error when he failed to properly evaluate the evidence in this matter and failed to properly consider the opinions of the treating sources.

(2)   The ALJ committed harmful error in his determination regarding credibility as it was not supported by substantial evidence and violated Social Security Ruling 16-3p.

(3)   The ALJ committed harmful error when he did not meet his burden at Step Five of the Sequential Evaluation.

(Doc. No. 15 at 1.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Fiktus was born in 1997 and a "younger" individual under social security regulations at all relevant times.  (Tr. 28.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  He has a high school education and is able to communicate in English.  (*Id.*)  He has no past relevant work.  (*Id.*)

### B.   Relevant Medical Evidence[2]

#### 1.   Mental Impairments

From April 12, 2016 through March 31, 2018, Fiktus sought treatment from Dr. S. Erfan Ahmed or Scott Brinkman, MSW, LISW, for medication management and counseling for his obsessive-compulsive disorder, major depressive disorder recurrent in full remission, and generalized anxiety disorder.  (Tr. 226-92, 716-28.)

On August 16, 2016 Fiktus saw Dr. Ahmed, and reported his energy was good and he was sleeping well, reading more, and hanging out with friends to stay busy.  He continued to experience episodic anxiety.  (*Id.* at 270.)

On September 23 and 30, 2016, October 14, 2016 and November 4, 2016, Mr. Brinkman noted Fiktus' "self-care skills are intact and unimpaired.  His domestic skills are intact and unimpaired.  He is performing normally in school. . . . A fair night's sleep is described.  Sleep was not continuous and not completely restful."  (*Id.* at 242-3, 250, 259, 263.)

---

[2]     The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  The Court notes that both parties improperly incorporated evidence in the "Argument" section of their Briefs which were not set forth in the "Facts" section of their Briefs, as required by this Court's Initial Order. (Doc. No. 5 at 3.)

On January 28, 2017, Fiktus saw Dr. Ahmed, and reported his energy was good and he was sleeping well.  (*Id*. at 236.)

On April 15, 2017, Fiktus saw Dr. Ahmed, and reported "he is always tired since he does not fall asleep easily, though he still gets about 9 hours of sleep a night."  (*Id*. at 230.)

On March 31, 2018, Fiktus saw Dr. Ahmed, and reported his "he gets sad on occasion but not too bad, 'I sleep and feel better.'. . . Energy is fair and complains of feeling tired easily. Working out with a trainer. . . his anxiety has improved."  (*Id*. at 226.)

Dr. Ahmed completed a Mental Source Statement dated May 18, 2019.  (*Id*. at 705-6.)  Dr. Ahmed noted Fiktus was being treated for major depressive disorder, generalized anxiety disorder, and OCD with clinical signs of depression, anxiety, some obsessive thoughts, feelings of anger and irritation.  (Tr. 705.)  Dr. Ahmed opined that, as a result of his psychological impairments, Fiktus would miss work one to two days per month and be off task 10% of the time.  (*Id*. at 706.)

### 2.     Physical Impairments

On May 10, 2011, X-rays at the Cleveland Clinic revealed a small left knee joint effusion and small nonossifying fibroma in Fiktus' left femur.  (Tr. 552.)

On April 4, 2017, Fiktus attended a neurology follow up appointment, seeking treatment for cognitive issues, spasticity and pain in his legs, and difficulty with fine motor movements.  (*Id*. at 328.)  Fitkus' pediatric neurologist reported a past medical history of spastic diplegic cerebral palsy secondary to perinatal intracranial and intraventricular hemorrhage, OCD, and depression.  (*Id*.)  On examination, Dr. Naila Goenka noted moderate spasticity in both legs, spastic gait, and full motor strength in both upper and lower extremities with the exception of ankle dorsoflextion bilaterally.  (*Id*. at 329.)

4

On February 26, 2018, Fiktus saw Dr. Daniel Kahn for treatment of abnormal blood pressure. (*Id*. at 308.)  Dr. Kahn noted that Fiktus had a significant diagnosis of cerebral palsy with gait disturbances, and was using a wheelchair as needed.  (*Id*. at 311.)

On April 20, 2018, Fiktus was examined at the Cleveland Clinic for his annual check up and transition to adult neurology. (*Id*. at 301.)  Dr. Robert Wilson noted that Fiktus has cerebral palsy with some occasional tightness of muscles, but "no real issues."  (*Id*. at 302.)  On examination, Dr. Wilson noted Fiktus had a stable neurological exam, truncal core control with high amplitude movement and scissoring of legs with poor plantar flexion.  (*Id*. at 303.)  He noted Fiktus got out of the chair and on and off the table well.  (*Id.*)  He described Fiktus as an "Amazing person in constitution in his choice to live life, be optimistic, and persevere."  (*Id*.)

On May 24, 2019, Fiktus had a rehabilitation consultation with Dr. Keith McKee, who noted Fiktus reported ambulating without an assistive device for short distances, and using a wheelchair for long distances.  (*Id*. at 1021.)  On examination, Dr. McKee noted limited range of motion bilaterally in Fiktus' hamstrings, quads, and GC due to spasticity, bilateral ankle clonus, and a spastic and diplegic gait. (*Id*. at 1024-25.)  He opined Fiktus does not need aid for safe ambulation. (*Id*. at 1025.)

On June 26, 2018, Fiktus had a urethral reconstruction due to a recurrent stricture.  (*Id*. at 633-41.)

On January 23, 2019, Dr. Kahn reported that Fiktus was doing well after the surgery, but he was sleeping 12 hours a day and still using a wheelchair as needed.  (*Id*. at 974.)

On May 24, 2019, Dr. Leslie Diruzza of the Cleveland Clinic completed a physical medical source statement. (*Id*. at 707-10.)  She treated Fiktus for his cerebral palsy, spasticity, hypertension,

asthma, and depression.  He had pain in his legs when he engaged in extended periods of walking. His legs also bothered him when he sat or stood too long. He had an abnormal gait and difficulty ambulating, with spasticity in the legs causing pain, but did not require a cane or other hand-held assistive device for ambulation.  Dr. Diruzza opined that Fiktus could sit for 120 minutes at a time and stand for 60 minutes, sit about 4 hours per day and stand/walk only 2 hours, would need to walk around every hour for 10 minutes, would need to take a 15-minute break every 2 hours, and had limitations with both hands.  Dr. Diruzza also opined that Fiktus' medications cause drowsiness, he would probably be off task 25% or more of the day and was incapable of even low stress work due to his OCD.  (*Id*.)

## C.    State Agency Reports

### 1.    Mental Impairments

On June 27, 2018, State agency reviewing psychologist Audrey Todd, Ph.D., reviewed the record and opined that Fiktus had mild impairment in his ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 76-7.)

On September 10, 2018, State agency reviewing psychologist Joseph Edwards, Ph.D., reviewed the record and concurred with the opinion of Dr. Todd.  (*Id*. at 89-90.)

### 2.    Physical Impairments

On May 12, 2018, State agency examining physician Dr. Dmitri Teague reviewed the file and opined that Fiktus had the following functional limitations:

- •    could lift at the light level of exertion;

- •    stand/walk only 4 hours in an 8-hour workday;

- •    sit about 6 hours in an 8-hour workday;

6

- limited with both lower extremities in the ability to use foot controls;

- should never climb ropes, scaffolds, or ladders;

- should never crawl; and

- should avoid all exposure to hazards including operating heavy machinery, unprotected heights and commercial driving.

(Tr. 78-80.)

On September 7, 2018, State agency examining physician Dr. Elizabeth Das reviewed the file and concurred with Dr. Teague's RFC determination. (*Id*. at 92-4.)

**D.     Hearing Testimony**

During the July 11, 2019 hearing, Fiktus testified to the following:

- He uses a wheelchair for long distances or places he will have to be walking for two or more hours, such as walking in the city, parks, and zoos. If he stands that long, his legs will be in pain. (Tr. 38-9.)

- He has tightness in his legs because of cerebral palsy. (*Id*. at 40.)

- He works part-time as a cashier at a gas station. He sits and works for about 5 hours, in his own chair. He still experiences pain in his butt and legs, and when he goes home he is so tired that he sleeps about 12 hours. He can't drive, so his mom drives him. (*Id*. at 41-2.)

- He got Cs and Bs in school, but had a really hard time with basic math. His best subject was history. He had an IEP, and got extra time for tests. He has chicken-scratch handwriting because of tightness in his arms. His arms are better than his legs, but it still affects him. (*Id*. at 43.)

- He has worked at the gas station for about a month. Before that, he worked at McDonald's. He was a prep person. His job required carrying heavy boxes, but he couldn't, so someone else had to do that for him. When he was there, he slipped and fell and hurt himself pretty badly. He managed his time there so he only had to stand for an hour or two. He didn't deal with customers. (*Id*. at 45-6.)

- He liked the job, but when he moved, Paratransit wouldn't bring him there. (*Id*. at 46.)

7

- He tried to get a driver's license.  It took him 3 tries to pass the test for his learner's permit.  When he tried driving, he couldn't focus on multiple things at once.  He was very, very close to being in an accident while student driving.  He drove onto someone's lawn.   He got a B in the driver's ed class, but actually driving was the hard part.  He last tried to drive in 2017.  He doesn't plan to try again because he doesn't want to hurt anyone.  (*Id*. at 47-8.)

- He sleeps a lot, because everything takes him double the effort of a healthy person, and he is exhausted.  (*Id*. at 49-50.)

- His anxiety affects him at work, particularly with handling money.  If he makes a small mistake, he worries about it throughout his shift and afterwards.  He eats or sleeps to calm down.  (*Id*. at 53.)

- In high school he had normal classes and support classes with special teachers who helped with papers, tests, and other things.  They helped him with writing a typing because of the issues in his hands.  (*Id*. at 54-5.)

- He goes for psychological counseling every couple of months, His anxiety and depression have both been really high lately.  (*Id*. at 56.)

The ALJ determined Fiktus had no past relevant work.  (*Id*. at 62.)  The ALJ then posed the following hypothetical question:

> The individual is limited to work of only sedentary exertional requirements with additional non-exertional limitations . . . . No climbing of ladders, ropes or scaffolds or crawling, occasional climbing of ramps and stairs, balancing, stooping, kneeling and crouching, no concentrated exposure to temperature extremes, particularly heat, but both temperature extremes, humidity or environmental pollutants. . . . No exposure to hazards such as heights, machinery, commercial driving and mental limitation that he perform routine tasks in a low-stress environment, no fast-paced strict quotas or frequent duty changes . . . . [A]re there jobs existing in the economy that this individual could perform?

(*Id*. at 62-3.)

The VE explained the hypothetical individual would be able to perform representative jobs in the economy, such as addresser, food and beverage order clerk, and document preparer.  (*Id*. at 63.)   He testified that the cashier position is normally performed at the light exertional level, but could be performed at the sedentary exertional level.  (*Id*.)

8

The ALJ posed a second hypothetical, adding the limitations that due to the symptoms of medically determinable impairments this individual would be off task at least 20% of the time.  (*Id*. at 66.)  The VE testified based on his training, experience, education, knowledge of the labor market and consultation with his colleagues, that this would eliminate competitive work.  (*Id*.)

Fiktus' counsel asked the VE to take the limitations from the first hypothetical and add the limitation that the hypothetical individual wouldn't be able to perform activities involving fine manipulation occasionally.  (*Id*.)  The VE testified this would eliminate all the jobs he had identified. (*Id*.)  However, a limitation to frequent handling and fingering would not eliminate any of the identified jobs.  (*Id*. at 67.)  The VE also testified that if an individual could only stand or walk for a total of two hours, and only sit for a total of four hours, they would be limited to part time work. (*Id*.)

### III.    STANDARD FOR DISABILITY

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or

9

medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since April 13, 2018, the application date.

2. The claimant has the following severe impairments: cerebral palsy, asthma, essential hypertension, and anxiety with obsessive-compulsive traits.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 416.945) to perform sedentary work as defined in 20 CFR 416.967(a), except that he cannot climb ladders, ropes, or scaffolds; cannot crawl; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, and crouch; can frequently handle and finger; he cannot have concentrated exposure to temperature extremes, humidity, or environmental pollutants; he cannot have any exposure to hazards (such as heights, machinery, and commercial driving);

10

and he has the mental limitation that he perform routine tasks in a low stress environment (meaning no fast pace, strict quotas, or frequent duty changes).

5. The claimant has no past relevant work.

6. The claimant was born on **, 1997 and was 20 years old, which is defined as a younger individual age 18-44, on the date the application was filed.

7. The claimant has at least a high school education and is able to communicate in English.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 13, 2018, the date the application was filed.

(Tr. 20-30) (internal citations omitted).

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec*., 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not

11

review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an

12

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    Evaluation of the Evidence, Including Treating Source Opinions

Fiktus asserts the ALJ erred in his evaluation of the evidence, and did not provide substantial evidence to support his findings because he failed to clearly explain how he determined that Fiktus could perform substantial gainful activity on a sustained basis. (Doc No. 15 at 8-9.) He notes that, in analyzing the Listings, the ALJ erroneously failed to even mention the wheelchair. (*Id.* at 9.) Further, he argues that the basis for the decision is unclear because the ALJ cited all exhibits 1F to 12F and made a generic reference to "Hearing Testimony," rather than identifying the specific records and testimony that supported his decision. (*Id.* at 10.) He also asserts that the ALJ failed to assess the medical opinions in accordance with 20 C.F.R. § 404.1520c. (*Id.* at 11.)

The Commissioner responds that substantial evidence supports the ALJ's assessment of Fiktus' RFC, because the ALJ properly considered all relevant record evidence. (Doc. No. 17 at 3.) She asserts the ALJ reasonably weighed the evidence in the record, including the medical opinions, and concluded that Fiktus was capable of a range of sedentary work that would allow him to perform a significant number of jobs in the national economy. (*Id*. at 7.)

i.      **Analysis of the Listings**

First, Fiktus asserts that the ALJ erred by failing to mention his need to use a wheelchair for long distances.  (Doc. No. 15 at 10.)  He cites evidence that one of his doctors, Dr. Kahn, repeatedly noted his need to use a wheelchair "as needed."  (Doc. No. 15 at 9, citing Tr. 311, 974.)

According to the Sixth Circuit, if an assistive device "[is] not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari,* 51 F. App'x 571, 575 (6th Cir. 2002). To establish that an assistive device is medically necessary, a claimant must provide documentation establishing the need for an assistive device to aid in walking or standing, and "describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). " SSR 96-9p, 1996 WL 374185, at *7.  Where use of a wheelchair is "intermittent" or "variable," including when a Plaintiff describes the use of a wheelchair as limited to "long distances," courts in this District have held that an ALJ did not err in omitting this limitation.  *See, e.g., Coakwell v. Comm'r of Soc. Sec.*, No. 1:19 CV 2876, 2020 WL 7711125, at *7 (N.D. Ohio Dec. 29, 2020).[3]

In this case, the ALJ addressed this issue as follows:

The undersigned notes that although the claimant appeared at the hearing using a wheelchair, his own physician stated on May 24, 2019, that the claimant does not require ambulatory aids. (Ex. 5F, p. 3). Counsel was unable to refer to an exhibit in the record with a prescription for an assistive device from a treatment provider. Here, the record does not indicate that an acceptable medical source prescribed the cane to the claimant. Neither does it elaborate upon the circumstances in which the claimant would need to utilize the cane. The claimant also testified that he only required the use of a wheelchair if he was going to be

---

[3]     In *Coakwell*, as in this case, there was also conflicting evidence regarding the need for a wheelchair.

standing or walking for 2-4 hours or more. Therefore, the undersigned does not find that the claimant's hand-held assistive device is medically necessary.

(Tr. 25.)

The ALJ identified substantial evidence supporting his determination regarding wheelchair use, and throughly explained his reasoning.  Although Dr. Kahn noted Fiktus' periodic use of a wheelchair, two other medical sources, Dr. Keith McKee and Dr. Leslie Diruzza, stated that Fiktus does not need aid for safe ambulation.  (Tr. 1025, 707-10.)  Therefore, the ALJ did not fail to mention Fiktus' reported need for a wheelchair, and did not err in omitting wheelchair use from the RFC.

### ii.    State Agency Reviewing Physicians' Opinion Evidence

Fiktus asserts that the ALJ erred by omitting the limitation to "occasionally use his bilateral lower extremities for foot controls," which was assessed by the State Agency reviewing physicians. (Doc. No. 15 at 12.)  The ALJ deemed these opinions "persuasive," and adopted their other opined limitations, yet concluded Fiktus could operate foot controls.  (Tr. 27.)  The ALJ, however, adopted a more restrictive standing limitations, determining that Fiktus could "only stand or walk for 2 hours out of an 8-hour workday."[4]  (*Id*.)

Since Fiktus' claim was filed after March 27, 2017,[5] the Social Security Administration's new regulations ("Revised Regulations")  for evaluation of medical opinion evidence[6] apply to this

---

[4]    The State Agency reviewing physicians had opined that Fiktus could stand or walk for 4 hours out of an 8-hour workday.  (Tr. 78-80, 92-4.)

[5]    Fiktus' claim was filed April 26, 2018.  (Tr. 160.)

[6]    The Revised Regulations differentiate between "medical opinions" and "prior administrative medical findings."  *See* 20 C.F.R. § 416.913(a)(2) & (a)(5). However, both have equal significance and are evaluated under the same factors. *See* 20 C.F.R. § 416.920c.

15

claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.  Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[7] (2) consistency;[8] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.   20 C.F.R. §§ 416.920c(a), 404.920(b)(2).

It is well-established that an ALJ need not adopt all findings in a medical opinion when determining an RFC.  *See Poe v. Com'r of Soc. Sec*., 342 F. App'x 149, 157 (6th Cir. 2009)

---

[7]     The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[8]     The Revised Regulations explain "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

16

("Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding"). Further, as discussed supra, the Revised Regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." C.F.R. § 404.1520c(a).  Determination of the RFC is the duty of the ALJ, and therefore the Sixth Circuit has explained "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Id., citing Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 197 (6th Cir.2004).

Here, the ALJ specifically cited the evidence that caused him to adopt a different physical RFC determination than that proposed by the State agency reviewing physicians:

> These opinions are largely consistent with the evidence in the record, which indicates that although the claimant had an abnormal gait due to muscle spasticity and reduced range of motion in the lower extremities due to his cerebral palsy, he was able to walk without an assistive device and he generally had good strength, intact sensation, and full range of motion in the upper extremities. His cerebral palsy was characterized as "mild" by treatment providers, and he managed his asthma and hypertension with an inhaler, dietary modifications, and medication. These findings suggest that the claimant can perform less than the full range of sedentary work, with postural, manipulative, and environmental limitations. Therefore, these opinions are persuasive. However, the undersigned finds that the claimant can operate foot controls, but can only stand or walk for 2 hours out of an 8-hour workday, he can lift and carry no more than 10 pounds, he has manipulative restrictions, and he should avoid concentrated exposure to temperature extremes, humidity, and environmental pollutants.

(Tr. 27.)  Although the ALJ's explanation of his reasoning could have been more through, he identified substantial evidence supporting his determination.  As Courts in this District have explained, "it is only necessary that the ALJ's explanation, in the context of the decision as a whole, afford an opportunity for meaningful review so that the reviewing court can ensure that the decision is supported by substantial evidence." *Moscorelli v. Colvin*, No. 1:15CV1509, 2016 WL 4486851,

at *4 (N.D. Ohio Aug. 26, 2016), *citing Miller v. Soc. Sec. Admin.*, No. 3:14 2274, 2015 WL 4394800, at *7 (M.D. Tenn. July 16, 2015). The ALJ has met that low bar in this case.

Further, even if the ALJ had erred in omitting the limitation to occasional operation of foot controls, Fiktus has failed to demonstrate that his limitation would impact the finding of disability in this case, given that the RFC adopted by the ALJ limits him to sedentary work,[9] and none of the representative jobs identified by the VE appear to involve any use of foot controls.[10] Therefore, even if the ALJ had erred, such error would be harmless.

### iii.    State Agency Reviewing Psychiatrists' Opinion Evidence

Fiktus asserts that because the ALJ deemed the opinions of state agency psychologists Dr. Audrey Todd and Dr. Joseph Edwards to be "partially persuasive," the ALJ was required to adopt limitations "regarding" the psychologists' indication that Fiktus has anxiety with obsessive compulsive disorder ("OCD") traits. (Doc. No. 15 at 12.) As noted *supra*, under the Revised Regulations, deeming an opinion partially persuasive opinion does not require the ALJ to defer to the opinion or adopt an RFC determination that repeats verbatim all the limitations contained therein. Further, Dr. Todd and Dr. Edwards did not identify any limitations resulting from Fiktus' mental health impairments, including OCD. (Tr. 76-7, 90.) Therefore, this assignment of error is without merit.

---

[9]    Social Security Ruling 96 9p defines "sedentary work" as involving sitting,, with walking or standing occurring "very little up to one- third of the time," or "no more than about 2 hours of an 8-hour workday."

[10]    The VE identified representative jobs of addresser, food and beverage order clerk, and document preparer. (Tr. 63.)

iv.      **Opinion of Dr. Ahmed**

Fiktus asserts that the ALJ improperly omitted the limitation  that Fiktus would be off-task

10% of the time or absent one to two days per month, which was contained in the opinion of his

psychiatrist, Dr. S. Erfan Ahmed.  (Doc. No. 15 at 12.)  The ALJ addressed Dr. Ahmed's opinion

as follows:

> The opinion of the claimant's physician Dr. Syed Ahmed is partially persuasive.
> (Ex. 4F). On May 18, 2019, Dr. Ahmed completed a mental residual functional
> assessment in which he opined that the claimant had some serious limitations in
> carrying out detailed instructions and in maintaining attention and concentration
> for extended periods, but that these activities were not completely precluded. He
> also opined that the claimant was able to carry out most of the listed mental
> activities. He also stated that the claimant had no side effects from medication,
> would be absent 1-2 days per month, and would be off-task 10% of the workday.
>
> This opinion is largely consistent with the record, which indicates that the
> claimant expressed feeling frustrated with his job search at times, but generally
> reported that he was doing well. He stated that his energy was good and he was
> sleeping well, and he denied any thoughts of suicide. He appeared calm, friendly,
> attentive, communicative, casually groomed, and relaxed. He had a normal
> weight, normal speech, intact language skills, an appropriate affect, logical
> thinking, and no signs of hyperactive issues or attentional difficulties. He was
> able to graduate from high school, work part-time, babysit his younger sister, and
> keep statistics for a hockey team. These findings suggest that the claimant is able
> to perform routine tasks in a low stress environment, but not that he would be
> off-task 10% of the workday or absent 1-2 days per month due to his impairments
> or treatment. Therefore, this opinion is partially persuasive overall.

(Tr. 27.)

As noted *supra*, it is not the role of this Court to re-weigh the evidence.  In this case, the

ALJ identified substantial evidence in support of his conclusion, most of it coming from Dr.

Ahmed's  own  treatment  notes,  and  coherently  explained  his  reasoning.   The  ALJ  provided

19

accommodations for Fiktus' mental health impairments, and he was not required to adopt verbatim the limitations in Dr. Ahmed's opinion.[11]

Further, the VE testified that off-task performance for at least 20% of the workday would not preclude competitive work, and offered no testimony regarding the allowable number of absences. (Tr. 66.)  Dr. Ahmed opined that Fiktus would be off-task 10% of the workday.  Because no evidence supports the assertion that a 10% off-task performance or 1-2 day per month absence rate would affect the determination of disability, even if the ALJ erred in omitting this limitations, such error was harmless.

**v.      Opinion of Dr. Diruzza**

Fiktus asserts that the ALJ also erred by failing to adopt the limitations contained in the opinion of his physician, Dr. Leslie Diruzza.  (Doc. No. 15 at 13.) Dr. Diruzza opined that Fiktus has the following limitations:

- stand or walk for about 2 hours in an 8-hour workday;

- need breaks every 2 hours for 15 minutes;

- could never lift or carry;

- had manipulative restrictions;

- would be off task 25% of the day; and

- could not perform even low stress work due to his OCD.

(*Id., citing* Tr. 707-10.)

---

[11]      The ALJ did address Dr. Ahmed's opined limitations in concentration and persistence in the RFC, by limiting Fiktus to "routine tasks in a low stress environment (meaning no fast pace, strict quotas, or frequent duty changes)." (Tr. 23.)

The ALJ explained he found Dr. Diruzza's opinion "partially persuasive" for the following reasons:

> On May 24, 2019, Dr. Diruzza completed a medical source statement opining that the claimant was restricted to standing or walking for about 2 hours in an 8-hour workday; would need breaks every 2 hours for 15 minutes; could never lift or carry; had manipulative restrictions; and would be off-task for 25% or more for a workday; the claimant was incapable of even "low-stress" work; and the claimant did not require a cane or other handheld assistive device. The portion of this opinion that pertains to the claimant's ability to stand and walk, and the lack of need for an assistive device, is consistent with the evidence in the record which indicates that the claimant was able to walk with an abnormal but independent gait. He also testified that he did not use his wheelchair unless he would have to be standing or walking for 2-4 or more hours. However, the remaining aspects of the opinion regarding the claimant's inability to perform even low-stress work, his need for breaks, and the percentage of time that he would be off-task, are inconsistent with the record.[12] Therefore, this opinion is partially persuasive overall.

(Tr. 28.) The ALJ adopted Dr. Diruzza's limitation that Fiktus was restricted to standing or walking for about 2 hours in an 8-hour workday.  The ALJ rejected the other limitations in the opinion based on the factors of supportability and consistency, as set forth in the Revised Regulations.  Although Fiktus may reasonably disagree with the ALJ's conclusions, they are coherently expressed and supported by substantial evidence.

Fiktus has convincingly argued that evidence in the record supports a finding of disability. However, as explained *supra*, the findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d at 772-3 (6th Cir. 2001); *Her v. Comm'r of Soc. Sec.*, 203 F.3d at 389-90.  The

---

[12]    In the immediately preceding paragraph, the ALJ addressed these issues in his discussion of Dr. Ahmed's opinion.

ALJ supported his RFC determination with substantial evidence and applied the proper legal standards.  Therefore, this assignment of error is without merit.

**B.     Credibility Determination**

Fiktus asserts that the ALJ did not properly evaluate the medical evidence and make a defensible determination as to whether Fiktus' testimony was credible.  (Doc. No. 15 at 15.)  This argument reiterates a number of the issues raised in section VI.A., *supra,* because Fiktus asserts that the ALJ erred by failing to properly consider the opinions of his treating physicians regarding the limitations Fiktus would have in performing work on a full-time basis.  (*Id*. at 16.)  He argues that, rather than considering the entire record, as required under the Regulations, the ALJ cherry picked evidence to support his desired conclusion.  (*Id.*)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g, Massey v. Comm'r of Soc. Sec*., No. 09  6527, 2011 WL 383254 at *3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[13] 2016 WL 1119029 (March 16, 2016).   Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the

---

[13]     SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the July 11, 2019 hearing.

alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  *See also Felisky v. Bowen*, 35 F.3d 1027, 1038 39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 834 (6th Cir. June 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[14] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms" SSR 16-

---

[14]     SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029 at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).  Neither party has argued the analysis is different under SSR16-3p, though Ingram has incorrectly asserted SSR 16-3p was issued following the June 28, 2016 ALJ decision.  (Doc. No. 13 at 9.)

23

3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §404.1529; SSR 16-3p, Purpose, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[15] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Fiktus' testimony regarding his physical and mental limitations. (Tr. 24.) He noted Fiktus testified that he was unable to perform full-time work because he could not stand or sit for long periods of time due to his legs painfully popping, and he used his wheelchair when he would have to travel long distances or walk for 2-4 hours or more. (*Id*.) He also noted Fiktus testified that a side effect of his muscle relaxants was fatigue, and that he had difficulty concentrating and problems with math and counting money, got anxious counting money

---

[15]     The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 732  733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

at his part-time job, he became preoccupied with making mistakes at work, and he ate or slept to help deal with his emotions. (*Id.*) The ALJ provided a discussion of Fiktus' treatment notes, the diagnostic testing, the objective findings upon examination, and the medical opinion evidence. (*Id.* at 25-6.) The ALJ determined Fiktus' medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the ALJ found his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with objective evidence of record. (*Id.* at 24.)

As discussed in section VI.A, *supra*, the ALJ considered evidence that both supported and conflicted with his determination of disability. Much of the evidence what Fiktus asserts the ALJ "ignored" - relating to impairments in concentration, walking, and his need for extra time on schoolwork - and is in fact addressed in his decision. (Doc. No. 15 at 16.) For example, the ALJ addressed Fiktus' testimony about difficulty with concentration, even though he cited the example that it prevented Fiktus from continuing at community college rather than the example that it prevented him from passing his driving test. (Tr. 24.) The ALJ acknowledged that Fiktus suffered fatigue, partially caused by his muscle relaxants and his anxiety. (*Id.*) Although Fiktus testified he could not work full-time because "all my energy basically is consumed by walking," he also acknowledged that he was able to attend school full time, even though he needed a nap when he came home. (*Id.* at 49.) Further, the ALJ provided limitations accommodating Fiktus' impaired concentration and limited ability to walk, although they are less restrictive than Fitkus' believes they should be. Although the ALJ did not directly address Fiktus' high school IEP accommodation providing extra time on schoolwork, his RFC determination limited Fiktus to "routine tasks in a low stress environment (meaning no fast pace, strict quotas, or frequent duty changes)." (*Id.* at 23.)

Fiktus has presented no evidence demonstrating that a more restrictive limitation is required in this area.

It is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, No. 09 2060, 2011 WL 1228165 at *2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at *6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  The ALJ considered a number of factors in assessing Fiktus' credibility, including his treatment course, the objective findings upon examination, and the opinions of the examining physicians.  These factors are supported by the evidence in the record and are sufficiently specific to make the basis of the ALJ's credibility analysis clear. The ALJ provided sufficiently specific reasons for his credibility determination and supported those reasons with reference to specific evidence in the record.  Fiktus' argument to the contrary is without merit.

**C.      Step Five**

Fiktus asserts that the ALJ erred in his Step Five analysis because "the ALJ disregarded any objective or subjective evidence which would have resulted in a finding of disabled." (Doc. No. 15 at 17.)  This argument is inextricably linked to Fiktus' assertion that the RFC determination adopted by the ALJ is not supported by substantial evidence.  However, as discussed in sections VI.A. and VI.B, *supra*, this argument is meritless.

It is undisputed that the ALJ asked the VE to consider a hypothetical individual with the RFC ultimately adopted in this case, and the VE testified that such an individual could perform

competitive work.  (Tr. 66-7.)   For the reasons set forth herein, the ALJ supported his RFC

determination with substantial evidence and applied the proper legal standards.   Further, because

the ALJ's hypothetical to the VE accurately incorporated the ALJ's RFC determination, the ALJ

properly relied on the vocational expert's testimony as substantial evidence in finding that Fiktus

was capable of performing jobs existing in significant numbers in the national economy. *See, e.g.,*

*Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001) (VE's testimony in response to an accurate

hypothetical question constitutes substantial evidence).   Therefore, this assignment of error is

without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.

 *s/Jonathan D. Greenberg*
 Jonathan D. Greenberg
 United States Magistrate Judge

Date: July 29, 2021

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**